IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LESLIE R. COLE,

        Plaintiff,

        v.                           Civil Action No. 5:08-CV-101

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.     Background

Plaintiff, Leslie R. Cole (Claimant), filed a Complaint on May 22, 2008 seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on November 6, 2008.[2]

Claimant filed his Motion for Summary Judgment on December 22, 2008,[3] and exhibits labeled

as "Plaintiff's Additional Evidence to appeals Council"[4] on January 2, 2009.  Commissioner

---

[1] Docket No. 1.  Claimant's complaint is not barred by the 60-day statute of limitations.
On April 10, 2008, Claimant requested an extension of the 60-day period to file a
complaint.  Tr. 12.  Claimant's request was granted on April 29, 2008, giving Claimant
an
additional 30 days.  Tr. 10.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket Nos. 10-12.

filed his Motion for Summary Judgment on February 2, 2009.[5]

B.    The Pleadings

    1.    Plaintiff's Brief in Support of Motion for Summary Judgment.

    2.    Defendant's Brief in Support of Motion for Summary Judgment.

C.    Recommendation

I recommend that:

    1.    Claimant's Motion for Summary Judgment be **DENIED** because the Appeals Council followed the applicable law in its review of the additional evidence together with the ALJ's decision.

    2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) on June 20, 2005, alleging disability since September 30, 2002. (Tr.54-57). The claim was denied initially on August 24, 2005. (Tr. 25). Thereafter, on September 19, 2005, Claimant filed a Request for Reconsideration. (Tr. 27). The claim was denied upon reconsideration on January 30, 2006. (Tr. 24). Claimant filed a written request for a hearing on March 27, 2006 (Tr. 26). Claimant's request was granted and a hearing was held on March 21, 2007. (Tr. 28, 361).

The ALJ issued an unfavorable decision on July 24, 2007. (Tr. 15-23C). The ALJ determined Claimant was not disabled under the Act because he had no impairment or

---

[5] Docket No. 13.

combination of impairments that met or medically equaled one of the listed impairments in 20

C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526), and the

Claimant was capable of performing past relevant work as a sales attendant. (Tr. 23-23C). On

September 21, 2007, Claimant filed a request for review of that determination. (Tr. 14). The

request for review was denied by the Appeals Council on February 14, 2008. (Tr. 5-7).

Therefore, on July 24, 2007 the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this

Court seeking judicial review of the Commissioner's final decision.

B.     Personal History

Claimant was born on January 21, 1947, and was fifty-five (55) years old as of the onset

date of his alleged disability and sixty (60) as of the date of the date of the ALJ's decision. (Tr.

57). Claimant was therefore considered a "person of advanced age," age 55 or older, under the

Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). Claimant graduated

from high school, completed two years of college, completed specialized job training in airplane

mechanics, and has past relevant work as a handy man and a ranger. (Tr. 66, 73).

C.     Medical History

The following medical history is relevant to the sole issue of whether substantial

evidence supports the ALJ's determination that Claimant's subjective complaints of pain and

functional limitation were not entirely credible:

**Preston Memorial Hospital, 2/13/03 - 3/25/03 (Tr. 107-14)**

Patient Admission Summary 2/13/03
Complaint: lower back pain; legs aching
Treatment: Celebrex, consider MRI
Diagnosis: muscular strain/ spasm

Radiology Report 2/13/03
Examination demonstrates degenerative disc disease at L4-5. Slight wedge deformity of L1 which may reflect a variant.
Impression: degenerative disc disease at L4-5; scattered changes of mild spondylosis; slight wedge deformity at L1 likely reflecting variant

Cardiology Imaging Report 3/25/03
Recommendations: EKG stress test; await nuclear scan results

**Progress Notes, Veterans Administration Medical Center, 5/9/03 - 2/1/05 (Tr. 115-29)**
2/1/05 Optometry Consult
no current eye or vision complaint

9/21/04 Clinic Note
Subjective: past medical history of hyperlipidemia and hypertension; visit for evaluation and management of hypertension.
Review of Systems:
- general review: negative
- cardiac: negative
- gastrointestinal: positive for chronic reflux
- psychiatric: positive for depression, under control
- all other systems: negative

Past Medical History: laminectomy done in 1989 due to a chronic back injury; history of hypertension; history of hyperlipidemia; history of coronary artery disease status post stent in 1998; history of osteoarthritis; history of gastroesophageal reflux disease; history of anxiety and depression. Most recent colonoscopy and stress test were negative.
Socioeconomically: abuses tobacco; denies any alcohol or drug use
Objective: awake, alert, oriented; no acute distress. Chest examination symmetrical and clear; cardiovascular examination showed S1 and S2, regular, no S3, no murmur; abdomen was soft, bowel sounds positive, nontender, no organomegaly. No edema; positive pulses; motor and sensory reflexes intact. Cranial nerves II through XII intact, except slightly decreased hearing. Musculoskeletal examination normal.
Assessment and Plan: use aspirin; continue Lipitor

10/6/03 Consultation
Assessment: not a hearing aid candidate

9/25/03 Physicians Note
Subjective: complains of chronic hearing loss; worked around jet engines, left greater than right. Complains of chronic vision loss; requesting an eye exam. Denies headaches, numbness, tingling, or weakness
Past Medical History: laminectomy done in 1989 due to a chronic back injury; history of hypertension; history of hyperlipidemia; history of coronary artery disease status post stent in 1998; history of osteoarthritis; history of gastroesophageal reflux disease; history of anxiety and

depression. Most recent colonoscopy and stress test were negative.

Socioeconomically: abuses tobacco; denies any alcohol or drug use

Objective: awake, alert, oriented; no acute distress. Chest examination symmetrical and clear; cardiovascular examination showed S1 and S2, regular, no S3, no murmur; abdoment was soft, bowel sounds positive, nontender, no organomegaly. No edema; positive pulses; motor and sensory reflexes intact. Cranial nerves II through XII intact, except slightly decreased hearing. Musculoskeletal examination normal.

Assessment and Plan: use aspirin; prescribed atenolol; continue Lipitor

9/25/03 Nursing Triage Note

Pain: 2 back pain

Mood/Depression Screen: negative

Given prostate cancer screening education

Given tobacco counseling

No changes in ability to independently perform activities in daily living

5/9/03 Spine Examination

Complaints:

- previous problems with low back pain since 1981
- portion of disc removed at Pittsburgh VA in either 1989 or 1990; unable to recall details
- dull pain to right of the center of low back; occasionally radiates to right hip; pain is 2 out of 10
- flare-ups of back pain approximately once/week
- unable to lift more than 50 pounds without difficulty
- wears a back brace if knows is going to be lifting

Exam: slight limp to the right; no acute distress; mild tenderness to palpation of the paraspinous muscles to the right side of the lumbar spine; no edema or discoloration. Flexion 45 degrees, which is lacking 50 degrees; increased pain with flexion. Extension 30 degrees, which is lacking 5 degrees. Lateral flexion to the right 25 degrees, which is lacking 15 degrees to the left; 30 degrees, which is lacking 10 degrees. Rotation to the right 25 degrees, which is lacking 10 degrees to the left; 30 degrees, which is lacking 5 degrees.

Impression: degenerative disc disease of lumbar spine

**University Health Associates, Progress Notes, 6/7/05 - 4/29/04 (Tr. 130-62)**

6/7/05

Chief Complaint: left-sided neck and back pain since 1989, increased over past eight months

History of Present Illness: left-sided shoulder pain since 1984. Given cortisone shots. Had surgery at L4-L5 in 1989

Past Medical History: bladder cancer diagnosed nine months ago; had surgery and chemotherapy. Cardiac stents; back surgery at L4-5 in 1989. Has hypertension and hypercholesterolemia edema.

Past Surgical History: L4-L5 laminectomy in 1989; lump removed from left breast (benign); stents put in the coronary arteries; and bladder surgery for cancer of bladder in 2004.

Physical Examination: low back exam reveals decreased lordosis; flexion and extension leads to

left-sided low back pain
Impression and Plan: myofascial syndrome; degenerative disc disease worse at C5-C6, not causing any nerve root compression; lumbago; post-laminectomy syndrome; cervicalgia; T3-4 old compression fractures.  Patient should use Tiger Balm and should do pushups, shoulder blade squeezes, abdominal crunches, cervical exercises, and Kendall exercises two times daily for three months and then one time daily thereafter.


3/8/05
Postprocedure Diagnosis: no evidence of disease
Procedure: surveillance cystourethroscopy
Plan: return in 3 months


12/14/05
Postprocedure Diagnosis: TA superficial low-grade bladder cancer; no evidence of disease
Procedure: diagnostic flexible cystourethroscopy
Plan: return in 3 months for repeat surveillance cystoscopy


8/31/04
Chief Complaint: blood in urine
Diagnosis: hematuria; bladder pain
Plan: PSA, Cysto


5/28/04
Subjective: presents with left-sided epistaxis.  Underwent left internal maxillary artery embolization; had persistent oozing afterwards and had a small pack placed.  Had an angiogram which revealed bleeding from posterior ethmoid distribution.  Had a slight amount of claudication while in hospital after embolization; has completely resolved.  Had some degree of facial dysesthesia of left maxillary area; getting much better.  No further bleeding.
Objective: nasal examination reveals rightward septal deviation.  Oral cavity and oropharynx are clear; neck reveals no masses.
Procedure: nasal endoscopy was performed
Assessment: complex epistaxis requiring embolization and pack currently doing very well
Plan: return on as-needed basis


4/29/04
Subjective: recently underwent left internal maxillary artery embolization by interventional radiologists.  Repeat angiogram revealed bleeding coming from posterior ethmoid distribution.  No surgical treatment was required.  Complaining of left-sided facial and jaw pain consistent with claudication from his embolization.
Objective: tympanic membranes are pearlescent bilaterally; nasal mucosa is moist without purulence or polyps.  Septum is midline and straight.  No evidence of bleeding.  Nasal airways are widely patent bilaterally.  Oropharynx is dry without erythema, exudate, or blood.  Indirect laryngoscopy reveals normal vocal fold movement bilaterally.  Post-glottic and false cord edema are present.

Assessment: resolved epistaxis
Plan: continue Tylenol

**West Virginia University Hospitals, 7/18/05 - 4/16/04 (Tr. 163-75)**
Urology Summary 7/18/05
Procedure: Cystoscopy and bladder biopsy
Operative Findings: bilateral ureteral orifices noted in normal position with clear efflux. Some mild erythema just proximal to left ureteral orifice. Six mm erythematous lesion with necrotic center on left lateral wall.

Urology Summary 9/13/04
Procedure: Transurethral resection of bladder tumor, medium

Otolaryngology Discharge Summary 4/23/04
Discharge Diagnosis: epistaxis, status post left internal maxillary artery embolization
Discharge Medication: Tylenol No. 3 one to two tablets
Reason for Hospitalization: copious bleeding from left side of nose

**Roger A. Lewis, M.D., Office Notes, 7/25/05 - 3/5/02 (Tr. 176-194)**
7/25/05
Chief Complaint: hyperlipidemia
Patient Report: no recent history of weakness, fatigue, fever, chills, night sweats, or fainting.
Patient complains of skin color changes - hyperpigmented-stable, and moles-hyperpigmented. L upper back-stable; hypertension - improved, and hyperlipidemia - aggravated; muscular pain-(L) lower extremity, (R) lower extremity - stable, joint pains - stable, and back pain - stable.
Diagnoses: hyperlipidemia, mixed - status: uncontrolled; coronary atherosclerosis of native coronary artery; unspecified myalgia and myositis - status: persistent; hypertension, essential, benign - status: controlled

6/14/05
Complaint: skin color changes; L upper back
Diagnosis: coronary atherosclerosis of native coronary artery; hyperlipidemia, mixed; hypertension, essential, benign, other seborrheic keratosis; unspecified myalgia and myositis; osteoarthrosis, generalized, involving multiple sites (general)
Recommendations: Celebrex; Crestor; Zoloft; Lipid Profile; AST ALT; CBS with diff & Platelets; ESR; office visit

3/28/05
Complaint: hyperlipidemia
Diagnosis: hyperlipidemia, mixed; hypertension, essential, benign; coronary atherosclerosis of native coronary artery; benign neoplasm of kidney, except pelvis
Recommendations: office visit per consulting doctor

2/21/05

Complaint: earache R
Diagnosis: pain in joint, shoulder region; otitis media, suppurative, acute, without spontaneous rupture of eardrum; disc disorder of cervical region, other and unspecified; spinal stenosis in cervical region
Recommendations: bactrim DS; Rhinocort Aqua Nasal Spray

1/3/05
Complaint: hyperlipidemia
Diagnosis: hyperlipidemia, mixed; hypertension, essential, benign; coronary atherosclerosis of native coronary artery
Recommendations: Lotrel; office visit; flu shot

11/8/04
Complaint: muscular pain - neck
Diagnosis: disorder of bone and cartilage, unspecified; closed fracture of dorsal (thoracic) vertebra without mention of spinal cord injury; unspecified musculoskeletal disorders and symptoms referable to neck; hyperlipidemia, mixed; hypertension, essential, benign
Recommendations: Crestor; Lipitor; Mobic; AST ALT

10/5/04
Complaint: bloody urine
Diagnosis: hematuria; coronary atherosclerosis of native coronary artery; hyperlipidemia, mixed; hypertension, essential, benign
Recommendations: MRI Scan; Lipid; Basic Metabolic Panel

7/23/04
Complaint: bloody urine
Diagnosis: hematuria; radiological and other examination of genitourinary organs, nonspecific abnormal findings on
Recommendations: office visit

7/20/04
Complaint: hypertension
Diagnosis: hematuria; special screening for malignant neoplasm of prostate
Recommendations: office visit; urinalysis; IVP; PSA

5/21/04
Complaint: hyperlipidemia
Diagnosis: hypertension, essential, benign; other malaise and fatigue; coronary atherosclerosis of native coronary artery; hyperlipidemia, mixed; anemia, posthemorrhagic, acute; cough
Recommendations: Niferex; Basic Metabolic Panel; office visit

5/3/04
Complaint: joint pains; knees

Diagnosis: Epistaxis; cough; other malaise and fatigue
Recommendations: AST ALT; Lipid profile; CBS with Diff and Platelets; Ultracet

1/16/04
Complaint: hyperlipidemia
Diagnosis: coronary atherosclerosis of native coronary artery; hypertension, essential, benign; hyperlipidemia, mixed
Recommendations: office visit; AST ALT; Lipid profile

10/24/03
Complaint: sinus congestion upper right thigh
Diagnosis: Sinusitis, maxillary, acute; hypertension, essential, benign, hyperlipidemia, mixed; unspecified viral warts; coronary atherosclerosis (general)
Recommendations: Bactrim; Flonase; continue current meds; informed consent obtained; nitrogen oxide; cholesterol control; increase exercise; trial of bactrim for sinusitis; AST ALT; Lipid profile

8/28/03
Complaint: chest pain right side
Diagnosis: unspecified chest pain
Recommendations: Celebrex; deep breathing exercises

7/21/03
Complaint: hyperlipidemia
Diagnosis: hyperlipidemia, mixed; other specified congenital anomaly of skin; open wound of toes, without mention of complication
Recommendations: Lipitor; Lipid profile; AST ALT; office visit

5/30/03
Complaint: hypertension
Diagnosis: hyperlipidemia, mixed; hypertension, essential, benign; coronary atherosclerosis (general); antacids and antigastric secretion drugs causing adverse effect in therapeutic use
Recommendations: Tricor; Axid; Zoloft; AST ALT; Lipid profile

3/4/03
Complaint: heartburn
Diagnosis: other specified sites, osteoarthrosis, localized, primary
Recommendations: Prevacid; Celebrex; Lipid profile; AST ALT; office visit

12/10/02
Complaint: hypertension
Diagnosis: hyperlipidemia, mixed; unspecified adverse effect of drug medicinal and biological substance, not elsewhere classified; hypertension, essential, benign; coronary atherosclerosis (general)

Recommendations: Lexapro; trial Lexapro; office visit

11/5/02
Complaint: hypertension
Diagnosis: hyperlipidemia, mixed; anxiety disorder, generalized; hypertension, essential, benign
Recommendations: Lipid profile; Basic Metabolic Panel; CBC with Diff & Platelets; office visit

8/6/02
Complaint: hyperlipidemia
Diagnosis: hypertension, essential, benign; hyperlipidemia, mixed; anxiety disorder, generalized
Recommendations: office visit

6/21/02
Complaint: laceration
Diagnosis: hypertension, essential, benign; contusion of unspecified part of lower limb
Recommendations: office visit

6/11/02
Complaint: foot pain - right foot
Diagnosis: hypertension, essential, benign; anxiety disorder, generalized
Recommendation: Lipid profile; SGOT: AST; SGPT: ALT; office visit

5/24/02
Complaint: skinsores R leg
Diagnosis: hypertension, essential, benign; contusion of unspecified part of lower limb;
Recommendation:  Lortab; office visit

5/20/02
Complaint: swollen extremities R lower leg
Diagnosis:  hypertension, essential, benign; contusion of unspecified part of lower limb
Recommendation: Amoxil; office visit

5/14/02
Complaint: skin color changes R foot
Diagnosis: hyperlipidemia, mixed; anxiety disorder, generalized; tobacco abuse, nondependent, use disorder; hypertension, essential, benign; contusion of unspecified part of lower limb; cellulitis and abscess of foot, except toes
Recommendation: Augmentin; office visit

5/9/02
Complaint: injuries R ankle
Diagnosis:  anxiety disorder, generalized; tobacco abuse, nondependent, use disorder; hyperlipidemia, mixed; hypertension, essential, benign; contusion of unspecified part of lower limb

Recommendation: office visit

4/1/02
Complaint: anxiousness/stress for weeks
Diagnosis: other and unspecified lyperlipidemia; anxiety disorder, generalized; hypertension, essential, benign; unspecified heart disease, ischemic, chronic; tobacco abuse, nondependent, use disorder
Recommendation: Norvasc, Prevacid, Zoloft, Wellbutrin, office visit

3/18/02
Complaint: hypertension
Diagnosis: other and unspecified hyperlipidemia; hypertension, essential, benign; unspecified heart disease, ischemic, chronic; anxiety disorder, generalized; pain in soft tissues of limb
Recommendation: office visit; Zoloft

3/5/02
Complaint: hypertension
Diagnosis: other and unspecified hyperlipidemia; hypertension, essential, benign; unspecified heart disease, ischemic, chronic
Recommendation: CV - stress test; office visit

**Physical Residual Functional Capacity Assessment, Cynthia Osborne, D.O., 8/18/05 (Tr. 195-202)**
Conclusion: the available medical for the DLI does not adequately and thoroughly address the Claimant's allegations. Insufficient evidence.

**Psychiatric Review Technique James Capage, Ph.D., 8/23/05 (Tr. 203-16)**
Assessment from 9/30/02 to 9/30/02
Medical Disposition: impairment not severe
Medical Disposition based on: 12.04 affective disorders and 12.06 anxiety-related disorders
12.04 Affective Disorders: depression
12.06 Anxiety-Related Disorders: anxiety/stress
found Claimant's statements to be credible

**Physical Residual Functional Capacity Assessment, Atiya Lateef, M.D., 1/19/06 (Tr. 218-26)**
Exertional Limitations:
• occasional lift: 20 pounds
• frequent lift: 10 pounds
• stand/walk for a total of: about 6 hours in an 8-hour workday
• sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
• push and/or pull: unlimited
Postural Limitations:
• climbing ramp/stairs: occasionally

- climbing ladder/rope/scaffold: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally

Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
- extreme cold: avoid concentrated exposure
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure

**Psychiatric Review Technique, Maurice Prout, Ph.D., 1/25/06 (Tr. 227-40)**
Assessment from: 9/30/02 - 9/30/02
Medical Disposition: impairment not severe
Medical Disposition based on: 12.04 Affective Disorders
Notes: no significant impact on ADL's, social functioning, etc.

**University Health Associates 9/19/06 - 8/2/05 (Tr. 245-57)**
Procedure Note 9/16/06
Postoperative Diagnosis: bladder cancer
Name of Procedure: cystoscopy
Impression: negative cystoscopy

Procedure Note 6/13/06
Postprocedure Diagnosis: history of bladder cancer
Operative Procedure: Surveillance Cystoscopy
Impression: negative cystoscopy

Procedure Note 3/14/06
Postoperative Diagnosis: history of transitional cell carcinoma of the bladder
Procedure: flexible cystourethroscopy
Operative Findings: no stones, tumors, or areas of inflammation identified within the bladder; mild lateral lobe BPH; 2.5cm from bladder neck to verumontanum

Procedure Note 11/8 /05
Postprocedure Diagnosis: recurrent transitional cell carcinoma of the bladder

Procedure: cystoscopy

**VAMC, Health Summaries, 2/1/05 - 10/26/06 (Tr. 258-72)**
All Problems
2/1/05: dry eye syndrome
2/1/05: hypermetropia
2/1/05: astigmatism
2/1/05: presbyopia
10/6/03: sensorineural hearing loss
9/25/03: HTN
9/25/03: hyperlipidemia
9/25/03: depression
9/25/03: hearing loss
9/25/03: tobacco use disorder
8/25/01: other unspecified back disorders

Outpatient Encounters
10/26/06:
diagnosis:  375.15-tear film insufficiency, unspecified
10/13/06:
diagnosis: 375.15-tear film insufficiency, unspecified; dry eye syndrome; astigmatism,
unspecified; astigmatism, NOS; presbyopia;
2/1/05:
diagnosis: 375.15-tear film insufficiency, unspecified; dry eye syndrome; 367.0 hypermetropia;
367.2 astigmatism, unspecified; astigmatism, NOS; 367.4 presbyopia

Examinations
5/9/03:
Impressions: AP, lateral, and both oblique views show no bone injury to spine.  Vertebral bodies
are of normal height.  Small marginal spurs at L4 and L5 bodies.  Disc spaces are narrowed at
L4-5 and to a lesser degree at L3-4.  Degenerative changes at the lower lumbar aopophyseal joint.
Abdominal aorta and common iliac arteries are calcified.  Degenerative disc disease of lumbar
spine.

**Cranberry Medical Clinic Medical Progress Notes, Roger Lewis, M.D., 12/8/06 - 3/9/07 (Tr.
273-85)**
3/9/07
Subjective: hypertension, hyperlipidemia, hemorrhoids, back pain, arthritis
Assessment: mixed hyperlipidemia; upper respiratory infection, benign hypertension

12/8/06
Subjective: hyperlipidemia; sinus congestion
Assessment: mixed hyperlipidemia, upper respiratory infection, benign hypertension
Plan: continue atenolol tablet, Celebrex, Crestor, Lotrel, Niaspan, Prevacid, Zoloft

12/6/06
Subjective: blood draw
Assessment: mixed hyperlipidemia
Plan: Lipid, AST/ALT

11/17/06
Subjective: flu shot
Assessment: vaccin for influenza

9/8/06
Complaint: hyperlipidemia
Diagnosis: hyperlipidemia, mixed; hypertension, essential, benign; coronary atherosclerosis of native coronary artery; osteoarthrosis, generalized, involving multiple sites (general)
Recommendation: Lipid profile; AST ALT

6/9/06
Complaint: hyperlipidemia
Diagnosis: hyperlipidemia, mixed; hypertension, essential, benign; coronary atherosclerosis of native coronary artery; osteoarthrosis, generalized, involving multiple sites (general); encounter for long-term (current) use of other medications
Recommendation: Advicor, basic metabolic panel, Lipid profile, AST ALT, CBS with diff & platelets; office visit

4/14/06
Complaint: hyperlipidemia
Diagnosis: hyperlipidemia, mixed; coronary atherosclerosis of native coronary artery; osteoarthrosis, generalized, involving multiple sites (general)
Recommendation: Niaspan, Lipid profile, AST ALT, office visit

**Garrett County Memorial Hospital, 10/14/97 - 7/13/99 (Tr. 286-92)**
Outpatient Medical Record
Treatment: use Tylenol for pain

Emergency Department Discharge Instructions 7/13/99
Instructions: increase Tylenol; return if pain persists

Outpatient Medical Record 9/20/98
Complaint: mid chest burning
Instructions to patient: x-ray

Medical Record 10/14/97
Chief Complaint: burning pain of left temporal area with some numbness; abdominal cramping; gas pains; intermittent numbness of right and left arms
Diagnosis: left facial neuropathy versus neuralgia

Treatment: Elavil 10 mg h.s.

**Emergency Patient Admission Summary 4/16/04 (Tr. 293-95)**
Complaint: bleeding from both nostrils; no prior bleeding problems
Treatment: pressured applied over bridge of nose
Diagnosis: Epistaxis

**Radiology Report, Stanley Lambert, M.D., 9/26/06 (Tr. 296)**
Impression: a tiny avulsion fracture, posterior aspect of the talus. May be acute. Old avulsion fractures of the medial and lateral malleoli are noted.

**Radiology Report, Preston Memorial Hospital, Thomas E Kilkenny, M.D., 2/13/03 (Tr. 298)**
Impression: degenerative disc disease at L4-5; scattered changes of mild spondylosis; slight wedge deformity at L1 likely reflecting variant.

**Admission Summary Report, Preston Memorial Hospital, 2/13/03 (Tr. 299-300)**
Chief Complaint: lower back pain
Treatment: Celebrex; consider MRI
Diagnosis: muscular spasm/strain

**Letter from Roger Lewis, M.D., 9/11/07 (Tr. 302-03)**
•     has been primary care physician for over 10 years
•     no appointments primarily concerning his back pain until recently
•     presented at end of July complaining of chronic pain in lower back bilaterally with radicular pain in the posterior aspects of both legs
•     pain in neck
•     presented previously to the emergency room at Preston Memorial Hospital due to a fall on February 13, 2003 and x-rays of LS spine were obtained. X-rays showed degenerative disc disease

**Wake Medical Center, Medical Record 7/16/97 (Tr. 304-05)**
Discharge Diagnoses: atherosclerotic heart disease with anterior myocardial infarction, status post tissue plasminogen activator therapy. Status post stenting of the left anterior descending coronary artery; tobacco abuse; status post lumbar diskectomy
Discharge Disposition: continue medications; return to normal activities as tolerated; maintain low cholesterol, low sodium diet

**Wayne Memorial Hospital, Medical Records 7/16/97 (Tr. 306-08)**
Chief Complaint: chest pain
Impression: acute anterior myocardial infarction, artheriosclerotic cardiovascular disease; angina pectoris; tobacco abuse
Disposition: admitted to Coronary Care Unit; nitroglycerin drip maintained; Lidocaine drip

**Department of Veterans Affairs, Medical Records 7/7/64 - 7/31/85 (Tr. 309-38)**

Rating Decision

Evaluation of status postoperative herniated disc, 14 and L5 with hemilaminectomy and diskectomy of L4 and L5 with associated lumbosacral strain and arthritis, which is currently 20 percent disabling, is increased to 40 percent effective March 27, 2003.

Chronological Record of Medical Care

12/10/71: sprained wrist

2/6/75: back of neck became stiff overnight; modest degree of muscle tightness in right lower cervical muscle

2/20/75: in car accident; problem in neck still exists; now experiencing painful burning sensation in left side of neck.

9/15/76: pain in left shoulder due to prior auto accident

9/23/76: sleeping better; much improvement in shoulder; burning has been completely relieved

8/2/77: intermittent severe low back pain; pain is localized to LS spine. Diagnosed as low back strain. Sleep flat on hard mattress or floor.

10/1/77: low back pain

4/24/78: low back pain recurrent. Pain felt in prolonged sitting and getting up from sitting position. Pain is localized to LS spine.

5/9/78: lower back pain. Diagnosed as low back strain

6/14/79: pain and stiffness on radical aspect of left wrist; slight swelling. Fracture distal aspect of left radius at articular surface. Cast applied.

7/12/79: removed wrist cast

11/6/80: pain in wrist; tenderness in left wrist. Diagnosed as sprain in left wrist.

2/23/81: hurt back again. Diagnosed back sprain.

9/3/81 Admission Record: admitted because of back pain (hurt it originally lifting luggage); diagnosed as severe muscle spasm of lumbosacral area.

1/30/84: doing much better; able to sleep

2/6/84: doing better; no problems sleeping. Still difficulty in moving arms

2/17/84: better; still pain in arms. Continue exercise.

2/23/87: mechanical low back pain


**Medical Records, Michael Dwyer, M.D., 8/4/07 (Tr. 340)**

Complaint: back pain; history of bladder cancer

Procedure: 3 Plane localizer; T1 FSE sagittal; T2 FRFSE sagittal; T2 FRFSE axial; T1 axial post contrast; T1 sagittal post contrast

Findings: cranial cervical junction has a satisfactory appearance; cervical vertebrae maintain normal height and alignment. Diffuse degenerative disc dessication; at C2-C3 and C3-C4 there is a slight disc bulge; varying degrees of disc space narrowing and bulge in certain areas; cervical cord is of normal morphology and signal

Impression: diffuse cervical degenerative spondylosis/degenerative disc disease


**Medical Records, Michael Dwyer, M.D., 8/4/07 (Tr. 341)**

Complaint: back pain; history of bladder cancer

Procedure: 3 Plane localizer; T1 sagittal; T2 FRFSE sagittal; T1 axial post contrast; T1 sagittal post contrast
Findings: lumbar vertebrae maintain normal height and alignment; T12-L1 disc level is unremarkable. Varying degrees of diffuse lumbar degenerative disc dessication and disc bulging.
Impression: varying degrees of diffuse lumbar degenerative spondylosis/degenerative disc disease. Disc bulge in combination with short pedicles and degenerative facet arthropathy results in moderate central spinal canal stenosis and mild bilateral degenerative neural foraminal encroachment at each level.

**Medical Records, Michael Dwyer, M.D., 8/4/07 (Tr. 342)**
Complaint: back pain; history of bladder cancer
Procedure: 3 Plane localizer; T1 sagittal; T2 FRFSE sagittal; T1 axial post contrast; T1 sagittal post contrast
Findings: mild thoracic kyphosis. Compression fracture of T4 vertebral body with anterior wedging and approximately 40% loss of height; appears to be old.
Impression: Chronic T4 vertebral body compression fracture. No retropulsion fracture fragments. Mild thoracic kyphosis. Otherwise, essentially unremarkable examination.

**Bolinger Chiropractic Center 10/11/88 - 8/3/89 (Tr. 343-47)**
10/11/88: lying back on exam table causes pain
10:13:88: muscle soreness in neck; low back feeling much better
10/21/88: slight discomfort, burning sensation in left side neck. No finger or arm involvement.
11/14/88: pain in left low back hip and leg
11/15/88: feels better but has soreness in low back
6/28/89: presents pain right PSIS; soreness in left leg
8/3/89: pain in right leg down to toes

D.     Testimonial Evidence

Testimony was taken at the hearing held on March 21, 2007. The following portions of

the testimony are relevant to the disposition of the case:

BY ADMINISTRATIVE LAW JUDGE:

Q     And are you on a disability retirement?

A     Partially, yes.

Q     What's the percentage?

A     40%.

Q        And why is that?

A        Back problems.

Q        Okay.  And how much do you receive monthly, from the, for retirement?

A        Approximately $1,300.00, Your Honor.   I, I don't have the exact figure.

Q        That's okay.  It doesn't need to be - - and that's the total you receive from the Government?

A        Yes.  That's the disability plus my normal retirement package (INAUDIBLE) subtracted.

Q        Yeah, but you were, and then you were also covered by the V.A. for hospital, medical stuff.  Correct?

A        Yes, sir.

Q        Okay.  Did you ever have any other vocational training other than the aircraft maintenance?

A        No, Your Honor.

Q        Okay.  When did you retire from the military?

A        1985.

Q        And have you worked anywhere since then?

A        I worked just after I got out of the service.  I worked in a convenience store for a while, mostly as a cashier.

Q        Um-hum.

A        And - -

Q        How long, how long did you do that for?

A       I think possibly a year or two, but my hands, part of the job was to help stock and, and change prices, and, and lifting of - - they sold beer, so there was lifting of 30-packs of beer, and it got to the point where I couldn't change any prices on things.  My arms or my hands would hurt and I just got to the point where if I did any lifting to restock the coolers, that I was in quite a bit of pain, and ended up leaving that job.

*         *         *

Q       Okay.  Now that was the Lewis Brothers.  Is that - -

A       Yes.

Q       - - in Terra Alta?

A       Yes, Your Honor.

Q       And you worked there for - - was that a full-time job?

A       It was, I think I worked approximately three days a week.

Q       So it wasn't really full-time.

A       No.

Q       Okay.  Because it doesn't - - your income for those years doesn't look like it's like a full-time, but after that you did work for a while for Martina Henry in Terra Alta?

A       Yes, sir.

Q       What did you do for her?

A       Mostly I listed the work as a handyman, because when I did my taxes, she paid me, but then I had to pay my own taxes out of everything, so when I went through the tax forms looking for a description I could use, that was the closest thing I could come to was handyman.  And I, I basically in when I first started with her, I was working taking care of her yard.  From

there, it progressed to, she decided to go into the antique business, and I would help her with that.

Q       Well yeah.  You're listed as actually employed at Hill and Hollow Antiques - -

A       Correct.

Q       - - for about two to three years - -

A       Yes.

Q       - - and that's, that's separate from Martina Henry.

A       Well, she was the owner - -

Q       No, no right, I know, but she was the owner, but, but you actually have some work for Martina Henry personally, and you also have some work for Hill and Hollow Antiques. So what did you do for the antique store?

A       Basically I was a cashier.

Q       And did you also do handyman work there?

A       Very little.  You know, when I say handyman, again, I'm, I'm saying that that was a, a just closest description I could get to what I was doing, which was just for tax purposes.

Q       But you were also a cashier at the store - -

A       Yes.

Q       - - for about a - - and you were there a couple of years?

A       Yes, I was, yeah.

Q       Now how much did you have to lift as a cashier?

A       Well, of course it was an antique shop and there was glassware and that type of thing.  I would you know, help straighten up, restock, that type of thing.

Q    Um-hum.  So what's the most you think you had to lift in the course of doing the ordinary cashier stocking work?

A    Probably a chair.

Q    Um-hum.  Was that like about 20 pounds, maybe?

A    I'd say close to that.  Well, less than that, really.  They were just like dining chairs, wood.

Q    Now are you mostly, are you mostly like standing during the day, walking, or did, was it, did they have like a stool you could sit on behind the register or whichever you wanted, or was it mostly standing or walking?

A    A bit of each and also had opportunity to lay down if I needed to.

Q    Oh, you could?

A    Yes.

Q    Really.  How often would you lay down during the day?

A    It depended on, well, it depended on two things.  One was if we had customers - -

Q    Sure.

A    - - which with the antique business, it's, it's not something that you have people in all the time, so I was able to lay down probably four or five times during a day, and - -

Q    For how long?

A    Well, depended on customers.  Normally, if I didn't have a customer, I didn't have something that had to be done at that time, I would lay down.  Otherwise, I was either standing or sitting - -

Q    Um-hum.

A          - - taking care of customers.

Q          And why were you laying down?

A          Pain in my back.

                          *                *                *

Q          - - for those years.  But you're right, but it's not, it's not full-time.  And then after

that, in '96, '97, '98, you've got Alpine Lake property Association and then self-employment.

Self-employment is reported up through 2005.  What's that kind of work?

A          That is with Mrs. Henry.

Q          Oh, that's the handyman work.

A          Yes.

Q          Okay.  And how much, how, how many days a week do you do something like

that?

A          Normally I would get together with her once a week if I was able.  Sometimes we

would schedule a day if I wasn't able to schedule another day.  They normally, it was for one,

one day a week to help her.  She is 85 years old.  (INAUDIBLE).

Q          Um-hum.

A          And she was afraid she had a booth in a mall, and she was afraid to go by herself.

Over the last four or five years that I worked for her, that she, she got to be afraid to be alone in

the car in case something were to happen to her.

Q          Um-hum.

A          So I would, I basically didn't do a whole lot, carry in a small box of glassware to

the booth - -

Q       Um-hum.

A       Unpack it.

Q       Oh, this like booth, her antique booth.

A       Yes.

Q       Okay.  Now, do you still work for her?

A       No.

Q       Okay.  So when did that stop?

A       I quit working with her approximately the first of April of '95.

Q       2005.

A       Or of 2005.

                        *               *               *

BY ADMINISTRATIVE LAW JUDGE:

Q       So go ahead.  I'm sorry, Mr. Cole.  You want to tell me what you, you know,

why, why you haven't been able to work basically at a full-time job around 2002?

A       Well, I, I had hurt my back several times during, in the service, but in 1981 - -

Q       Um-hum.

A       - - I lived in Germany.  I picked my baggage up incorrectly I guess, but of course

it was heavy.  And I hurt my back.

Q       Um-hum.

A       I didn't want to stay in Germany so I suffered until I got back to the States and

was on my way home and when I got into D.C., I was able to continue on home here to West

Virginia.

Q       Um-hum.

A       I checked, got a taxi and went to the military hospital there in D.C., at Andrews Air Force Base, and they admitted me for six weeks. I was flat on my back. After that I was probably six months light duty after that.

Q       Um-hum.

A       Wear a back brace and still wear braces when I'm doing anything at all that you know - -

Q       Um-hum.

A       - - other than sitting or standing or laying down.

Q       Um-hum.

A       Then in, I believe it was '89, I had back surgery - -

Q       Um-hum.

A       - - at Veterans' Hospital in Pittsburgh and when I had the back surgery, I was unable to basically do anything for myself prior to the surgery. I, I spent about a week or better on the floor, only going to the bathroom, to the potty. I used a jug. I laid on the floor until they were able to get me into Clarksburg or Pittsburgh.

Q       Pittsburgh.

A       After the surgery, I was able to get off the floor. I'd been in pain with my back off and on since then, to the point where I didn't make schedules. Anything I did, I was contingent on whether I could or could not go to work that day.

Q       Where were you working at that time?

A       Well, during, from the, the period there, would have been Lewis Brothers

(INAUDIBLE) my other ranger job and also, I'm trying to think of when the, the dates that I'm not sure, but anything after '89 that I was employed at, which would be Mrs. Henry and - -

Q       Oh, the golf ranger, was that, was Alpine Lake property.  It was around '96.  And the Lewis Brothers and there was E.H. Management very briefly.

A       Okay.

Q       So it was mostly Lewis - -

A       Yeah.

Q       - - after Mrs. Henry.

A       I'm sorry.  Those jobs were all contingent on whether I was able to physically you know, work.  They knew that if I called in sick or that I was laid up.

Q       So how many days, how often would you end up missing work after the surgery?

A       I would say with Mrs. Henry and working one day a week, in a two-month period, we would end up changing days at least once if not more, in that period, in a two-month period, because I wasn't, I'd get up in the morning and tell her that you know - - normally what we did was we would call if we had anything scheduled, we'd call each other and decide whether either one of us was able to do it that day and if not, then we'd postpone it to another day.

Q       Okay.   And then what kind of treatment have you had since the surgery?

A       I was, I've been to the hospital probably three or four times with my back since then.  I remember one in Clarksburg at the V.A.  I was at Kingwood Emergency Room and other than that, to the doctor, I doctor with Dr. Lewis (Phonetic), and basically bed rest and, and he has me on, Dr. Lewis put me on Celebrex and - -

Q       And you said you still use a brace?

A       Yes.  I use both - - if I'm doing anything other than sitting, standing , I normally put a back brace on.

*          *          *

BY ADMINISTRATIVE LAW JUDGE:

Q       Dr. Lewis notes you were, in early 2002, you're talking about high blood pressure, complaints of fatigue improved slightly.  What, I mean, what other, what other kinds of things did you do for your back?

A       Basically Your Honor, the only thing that I do for my back is try not to hurt it.

Q       Okay.

A       I, I'm on Celebrex, which is the only thing that I think is pain-killer-wise.  I've learned after close to 20 years with this, to be very careful of what I do.

Q       Um-hum.

A       And I guess that's the biggest thing is, is I've learned the capabilities I have and I, I try to stick with it.

Q       And what kind of capabilities have you had say around September of '02, best you can remember, say in terms of like walking or standing?

A       In '02, the back problems had, had progressed and again, in, in that time frame I was flexible - -

Q       Um-hum.

A       - - with my employers, where you know, if I couldn't make it, I, I didn't have to, and from, well, in I believe it was '98 when I had the heart attack - -

Q       Um-hum.

A        - - and I noticed that after that, that I fatigue easily.  I don't sleep.  It takes me anywhere from, well I normally go to bed around 10:00 in the evening, between 10:00 and 11:00.  The wife comes to bed around 1:00 and I'll still be awake - -

Q        Um-hum.

A        - - because I haven't found a comfortable position that I'm not in pain.  It, and during the night, I'll, I don't think I get two hours uninterrupted sleep.  I wake up in pain.  I have pain in my hands that I wear - - if I don't put my braces on at night, I wear wrist braces on both hands that were suggested by Dr. Lewis.

Q        Um-hum.

A        And if I don't put those on, I'll wake up with pain in my hands that'll be enough to wake me up.

Q        How long have you worn the wrist braces?

A        It's been probably four or five years now, I've been using the wrist braces at night especially.  And sometimes a few years ago, I would travel down to see my brother-in-law and I'd wear the wrist braces while I was driving.

Q        Um-hum.

A        It seemed to help.

Q        And now normally this is for carpal tunnel syndrome.  Do they, but normally there's a simple surgery they can do for that.  Did they, have they done the, have they recommended any surgery for your hands or anything?

A        Dr. Lewis said that I could have that, well, he had me tested and it was, I forget what year it is.  It should be in the records.  For carpal tunnel, they diagnosed it as I believe

either mild to medium and at that time, it didn't warrant surgery. One thing that, one of the records I'm trying to get from the service is I had broken my right wrist and sprained my left wrist and had them both in a cast for one in a cast and the other wrapped at the same time, and I, but those records I have not been able to get yet, from the military.

Q      Okay. Well, are you able to use like a knife and fork?

A      I can use my hands intermittently for - - an example. I wanted to change a mount in my car. I've been a mechanic all my life and I, I had a transmission mount that was bad. Four bolts - -

Q      Um-hum.

A      I was unable to take out any one bolt at a time. I had to stop because my hands hurt and take a brake from it and go back and then finish taking the bolt out.

Q      When was this?

A      This has been a month ago. It took me probably five hours to change that mount, which should have taken ten minutes.

Q      Now - -

A      I don't want to quit being you know, being physical, but I am to the point where I know that I have limitations to what I can do.

Q      Now how far, when we're looking back in 2002, how far could you normally say walk in a stretch back then, say on a level surface like a grocery store or a mall?

A      Let's see, approximately in that time period, I witnessed a motor bike accident. Two kids out riding separate bikes, and one run over the other one. I was less than 100 yards from them and I could not run the distance without stopping and I think I stopped probably three

times trying to get those kids and I was unable to continue running and I ended up walking part of the way.

Q    Well that's running, but how, I mean, how about just walking?

A    Well, I mean, well, at that period, probably 100 feet and you know, take a short break and, and go again.

Q    Okay.  How about just standing and when I say stand, I don't mean like stand at attention, but if, if you're standing at a small area like a sink or stove.  How long could you like stand at a stretch?

A    I couldn't stand very long.  I'd, I'd have to move around.  I, I - -

Q    But you're able to - -

A    - - move my feet, you know?

Q    Yeah, if you're able to move a little bit, like as I say, not at attention, but you're able to move your feet, move a few feet around, move in a small, like a kitchen, move around within a kitchen, how long could you, say stand, doing that?

A    Without pain?

Q    No, with, with pain.  How long could you force yourself to stand?

A    I don't, I don't try to stand.  I, I set things up in the morning, to where I can do different things at different times, different positions, so that I'm not in any one position more than 10-15 minutes.

Q    Um-hum.

A    Because I'm in, right now, I am in quite a bit of pain, between my neck and my legs and my back.

Q        How long can you normally sit before you have to get up and move, assuming you can shift around in the chair a little bit?  But when would, how long could you stay there before you'd have to get up and stretch or walk around?

A        To sit in a chair, less than a half an hour.  I mean, if I had to sit in that chair, it would be less than a half an hour.

Q        Now back again, looking at 2002, about September roughly, if you can remember, tell me how much, roughly, what's the most you think you could lift with both hands at that time.  And when I say lift, I don't mean bend over to the floor and pick up off the floor, but if you're like sitting or standing at a table, like the one you're at, how much do you think you could say pick up and move to a refrigerator or move to another table or such?

A        I've learned to, I try not to pick up more than 15-20 pounds.

Q        Um-hum.

A        The most I would even attempt at one time - -

Q        Um-hum.

A        - - one day, would be 35-40 pounds - -

Q        Um-hum.

A        - - because I know what the results would be.

Q        It would wind up hurting your back.  Well, back in 2002, what kinds of things made your back pain worse?  I mean, you, you mentioned things like prolonged sitting or standing or walking, but anything else cause the back pain to get worse?

A        Any, anything physical, Your Honor, is - - I don't know how to say it.  Right

now, I have a burning across the back of my back.

Q      Um-hum.

A      I have, it's like I'm sitting on a piece of two by four about that long, running the length of my leg.  My right leg and I didn't know this until I was researching the records.  I had broken this right ankle twice.

Q      Um-hum.

A      The right leg up to the knee aches.

Q      Um-hum.

A      My neck right now, feels like I've got a - - I don't know - - one side or the other just - - I can't explain the pain.  I can't say it's a burning or, or what, but it's, I'm very uncomfortable.

Q      Well, have you gotten treatment for your, for the problem around your neck?

A      I, there was an MRI taken at Kingwood Hospital.

Q      When was that?

A      That's been approximately a year ago.  From that, Dr. Lewis, who's my family doctor, the results went back to him, showed that I had cracked vertebrae.  And he sent me to Morgantown, to University.  I can't remember the doctor's name, but they didn't, they - - it was an old fracture and there really wasn't anything I could do about it.

Q      So you have pain in the neck area and your low back and legs?

A      Yes, sir, Your Honor.

Q      And is this constant or does it come and go?

A      It's constant.

Q        Okay.

A        It, it dulls out.  One of the things I do, is I try to get my mind off of it.  I think about something else, just to keep moving.  It, I would say I'm in pain almost, all my waking hours.

Q        Um-hum.  Well now, how does - - do you take anything other than the Celebrex or the brace to deal with the pain in your back and, and neck?

A        No, because the only thing that I've tried Ibuprofen, Tylenol, all the others.  They don't work for me.

Q        Um-hum.

A        The ones that do work are prescription medications such as Codeine - -

Q        Hydrocodone or Vicodin or, yeah.

A        That, and I've taken - -

Q        Well, why don't you take those?

A        They mask the pain and all I end up doing is hurting myself more than I already am.

Q        Why do you say that?  I don't understand why you say that.

A        The reason I say that sir, Your Honor, is that when I mask the pain, I try to overdo what I'm - -

Q        Oh.

A        Then all I have to do in the morning is get out of bed, and look in the mirror, and my body will be separated this way.  It's like you go, if you drew a line, my chest would be here and the rest of my body's over here.  And I can't (INAUDIBLE), no matter how hard I try.  And

I know that just looking in the mirror, that I've hurt my back, even though I've got pain killers and I'm in some amount of pain, but I know that I've really messed up.

Q       Okay.  Now have they, since, have you had any surgery or any kind of medical treatment since the '89 surgery?

A       I've been to the emergency room, I think three times with my back and they gave me pain killers and bed rest.

Q       And, that's which emergency room?

A       V.A. Emergency Room in Clarksburg.

Q       V.A. Clarksburg, okay.

A       And also Kingwood, Preston (Phonetic) Memorial.

                    *                    *                    *

Q       Does the Celebrex help any?

A       It, I've been on it for quite a while, and I, it helps with the joint pain some.

Q       Um-hum.  Now, you said you had a heart attack in '98?

A       Yes.

Q       And have you had any treatment since then, for your heart?

A       I've had, I'm on a schedule basis with Dr. Lewis you know, to monitor how I'm doing.

Q       Just every, every so often.

A       Yeah, and I'm on several medications.

Q       What medicines are you taking?  Let me show you - -

A       I've got several.

Q    Well, you're taking Crestor for - -

A    Crestor - -

Q    And - -

A    Atenolol - -

Q    Atenolol is, it's a blood pressure pill.

A    - - and I take cholesterol medication.

Q    That's the Crestor.

A    I'm trying to find my listing.

Q    And the, actually, those are the only ones you, you have listed Niaspan - -

A    Yeah.

Q    - - which, that's looks, that sounds like a Niacin supplement.  Crestor, which is for cholesterol, Atenolol, which is blood pressure pill, then you have Lotrel, and Sertaline is an anti-depressant.  Prevasid is for your stomach.  What, what's the Ltorel for?  And you have, you also have listed Nitro.  Is that nitroglycerin?

A    Lotrel I believe is for the heart, blood pressure, and the Nitro, I keep that with me at all times.

Q    How often do you have problems with chest pain?

A    I probably - - let's see, I can't, it's been a while since I was at the emergency room.  Chest pain is mostly associated with indigestion now.  I only take the Nitro if, you know, as a, to see if I'm having any heart problems.  You know, if it doesn't help, then I know it's not the heart.

Q    Yeah.  So you're really not having much heart pain.  The, the - -

A       Other than the fatigue effects of it.

Q       And how, how often do you have problems with fatigue?

A       Daily.

Q       How do you deal with that?

A       Rest.

Q       How much, how much do you, how often have you had this fatigue problem? How long has it been?

A       Since the heart attack, I've been more fatigued then I was before.

Q       Anything make it worse, cause you to have more fatigue?

A       It's pretty much the same everyday, Your Honor.  It's - -

Q       All the time, it's pretty much the same?

A       Yes.  It's, if I do anything, for instance, the other day, I noticed it's about 100 yards to, or about 100 feet from my house to the garage, and the kitchen trash bag was full, and I carried it out to the garage, and by the time I got to the garage, I was feeling the effects of, of the walk and the carrying of 10, 15 pounds.

Q       Okay.  Now, back in the - - you, you, you did have bladder cancer, but that looks like it's been cured, and it's also looked like it arose after 2002.  Have you, did you have any other medical conditions other than the heart condition, your spine, and the carpal tunnel in your wrists, as of around the end of 2002?   Is there anything else you were being treated for or had going on you know, physically or mentally?

A       Nothing I can think of, Your Honor.

Q       You take, you're, you're taking an anti-depressant now, Sertaline.  Did you have

any depression or anxiety going on in 2002?

A       Yes.  I've been - - part of the, I think part of the, the, some part of my sleep habits are affected by the depression, I believe, Your Honor.

Q       Um-hum.  What kind of treatment have you had for the depression, over the last five or six years?

A       Just the medication.

Q       And who prescribes that?

A       Dr. Lewis.

Q       Has he ever suggested that you see a psychologist or psychiatrist or anything like that?

A       No, Your Honor.  He and I talk about my condition on a regular basis, and neither one of us felt that that would be helpful.

Q       Anything make you feel more depressed or more anxious, about back five years ago?  Anything worsen your depression?

A       If I made a mistake, not, not just a mistake.  If I said something that, to someone that after I'd said it, I regretted saying, I would think about that for days, sometimes.

Q       Um-hum.

A       So it was - -

Q       Now how does the, does the Sertraline help with the depression?  Does it help you feel better?

A       I really don't know.

Q       Um-hum.  Do you have any side effects from any of the medicines you take?

A      None that I know of, Your Honor.

Q      How do you spent your time most days, back five years, and again, we're looking at 2002?  How did you used to spend your time back then?

A      At, at that time, pretty much was the work and just little odd jobs around the house.

Q      When you say odd jobs, what kinds of things do you mean?  Do you like gardening, lawn work, things like that?

A      I'd kept the lawn, you know, minor things, change light bulb, little, little things.

Q      Were you, back then, were you still able to do any mechanic work on your car or engines or anything?

A      I was limited.  Things that I could do years ago in ten minutes, would take me a half a day.

Q      Um-hum.  Were you, now, did you go out grocery shopping and things like that?

A      The wife does most of the shopping.  The only time that I do anything like that is if I'm in town for a doctor's appointment or have to have medication, then I might stop and get a loaf of bread or some eggs or something.

Q      Now do you, back again, we're looking a four and a half years ago or so, were you able to get out and go to a restaurant or church or movies or anything like that?

A      I was able to go about any place I wanted to, as long as I was able to change positions.

Q      Um-hum.  Did you spend a lot of time watching TV or reading?

A      Not - - a little TV in the evening.

Q      Um-hum. Okay. Were you, now did you help out around the house with cooking and cleaning, dishes, laundry, things like that, in 2002?

A      Yes. The wife and I pretty much try to share, share the things. One thing I hate is doing dishes, so that's pretty much her job unless she's sick, but other things around the house I was able to do on a limited - - again, I, I try to make things so that I can change positions about every 10-15 minutes.

ALJ      Okay. I don't have any other questions of Mr. Cole. Mr. Wehner, anything you want to ask him?

REP      Yes, Your Honor. Thank you.

*            *            *

Q      And concerning the earnings record, could you explain briefly what the handyman, that you describe as the tax basis for your filing income tax? What actually did you do as part of that job?

A      I, at, with Mrs. Henry, she was up in age and she got to the point where she didn't want to drive any distance without having somebody with her. Anything over ten miles, she would have me, for instance, if she had to come to the doctor or whatever, her in Morgantown, and it's little things there with her antique shop. You know, in a, normally work one day a week, four to five hours, and in the four hours, physical labor was probably less than 45 minutes. It was a matter of taking a box from her house, put it in her car, take it to the shop, set it down. She placed it because you know, it was just menial stuff, but the only reason that the handyman phrase was used, was for tax purposes, because when I went through the federal tax forms, I couldn't find anything else that would - -

Q      Well, as far as yard work, did your handyman job description include yard work?

A      No.

Q      Did you mow the grass?

A      Not, not - - when I first started working with Mrs. Henry, which would have been 20 years ago, I started as doing yard work with her. And it - -

Q      So what yard work did you do, mow grass?

A      I mowed grass, picked up limbs and that type of thing, but that was back 15 years ago. Since then, I have only done the things I've described as the handyman in the - -

Q      Which is changing light bulbs?

A      Yeah, possibly if she didn't, you know, if she needed a light bulb changed, I'd change a light bulb.

Q      So you were not cutting trees or painting walls or fixing the roof?

A      I was not doing anything of any real physical work.

Q      I want to ask you about your wrists. What trouble do they give you?

A      They go numb at night. If I don't wear the brace, they go numb, they ache, they will wake me up.

                    *              *              *

REP     What was the cause of your, what is the cause of your neck pain? I did not recall - -

ALJ     He said, he said he had a fractured vertebrae they found a year, like a year ago. Dr. Lewis sent him and they did an MRI and they found an old fracture.

BY REPRESENTATIVE:

Q       Okay.  Mr. Cole, I want to ask you about your travel limitations.  Are you able to drive distances that would help you get to work and back?

A       This morning when I left the house, within the first mile, I started feeling the burning in my back, then the five miles, the pain in my legs.  I was wearing a back brace at the time.  I drive with it normally.  It took me, I timed it.  It took me an hour and ten minutes to get here and from less than - - I was in pain to where I, when I got here, I got out of the car and I had to walk around some just to get, to get a little relief.

Q       Now having for instance, driven today, does that limit the rest of your driving ability for the week?  Do you have to pay and recover from travel?

A       From the time I get home this afternoon, I'm going to be in bed.

Q       How long do you estimate it would take you to recover from the driving today?  We're going to talk about 2002 here, (INAUDIBLE).

A       I'd say I'll lay down and for at least two hours when I get home, and then go back to bed tonight at my normal time, and I'd be able to make the trip again tomorrow, with probably the same results.

Q       Well, in 2002, you had limitations on your getting to work reliably.

A       Yes.  I, I had an understanding with my employers that they knew I had the back problems and they've even sent me home because they knew I was in pain.

Q       So would you be able to do an eight-hour a day, five day a week job, reliably?

A       No.

Q       What would keep you from attending regular work hours?

A       I wouldn't know what days that I'd be able to work.  I base everything on how I

get out of bed every morning.

      Q     How often are you not able to get out of bed in the morning, in sufficient condition to go to your job?  How often does that happen?

      A     I would say that if I take a job, I like to do it, so I'm going to go to work in pain if I  am contracted to do that.  But they'll probably be one day in every two weeks, that I would break that.

      Q     Does your pain then allow you to complete the other eight hours a day, five days a week, hours you would work?

      A     It all depends on how much freedom I have to lay down, (INAUDIBLE).

      Q     Okay.  And as far as doing dishes, do you have any limitations - -

      ALJ    He said he doesn't do dishes.  His wife does it.

      REP   All right.  Then I would have no further questions at this time.

**E.**     <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- Walks to straighten back (Tr. 77)

- Does odd jobs around the house (Tr. 77)

- Watches tv (Tr. 77)

- Takes care of a dog and cat (Tr. 78)

- Can still do everything could do before being injured (Tr. 78)

- Has difficulty sleeping (Tr. 78)

- Sometimes has difficulty putting on socks (Tr. 78)

- Difficulty washing feet (Tr. 78)

- Prepares meals (Tr. 79)

- Does household chores (Tr. 79)

- Spends time outside of the house (Tr. 80)

- Drives (Tr. 80)

- Shops for groceries once per week (Tr. 80)

- Is able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 80)

- Can no longer play golf regularly (Tr. 81)

- Spends time with others (Tr. 81)

- Visits mother weekly (Tr. 81)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the Appeals Council (AC) violated five provisions regarding its review of the ALJ's July 24, 2007 decision and therefore substantial evidence existed to overturn the ALJ's decision at the Appeals Council level and on appeal.  First, Claimant argues that the AC violated 20 C.F.R. 404.1780(a) by failing to grant Claimant permission to file briefs and other written statements.  Second, Claimant contends that the AC violated 20 C.F.R. 404.975 by failing to grant Claimant permission to file briefs or other written statements about the facts and law relevant to the case.  Third, Claimant contends the AC violated 20 C.F.R. 404.976(b)(1) by failing to grant Claimant permission to file new and material evidence relating to the period on or before the date of the ALJ's decision.  Fourth, Claimant argues the AC violated 20 C.F.R.

404.970(b) by failing to consider additional evidence.  Last, Claimant argues the AC violated 20

C.F.R. 404.1785 by failing to consider material evidence after failing to permit submission of

new evidence.

Commissioner contends that the relevant time period ends on September 30, 2002, the

date of Claimant was last insured.  Accordingly, in considering all the evidence in the record, the

ALJ correctly concluded that prior to September 30, 2002, Claimant retained the functional

capacity to perform the range of light work he previously performed.  Additionally,

Commissioner maintains that the ALJ correctly assessed Claimant's credibility and rightly

concluded that while his impairments could reasonably be expected to produce some pain, his

statements were not credible to the extent alleged.

B.    Discussion

I.  The Appeals Council Violated 20 C.F.R. 404.1780
by Refusing Plaintiff's Request to Submit Briefs;
AND
II.  The Appeals Council Violated 20 C.F.R. 404.975
by Refusing Plaintiff's Request to Submit Briefs.

Claimant argues that the Appeals Council violated the Code of Federal Regulations by

failing to grant Claimant permission to file briefs or other written statements about the facts and

law relevant to the case.

Unfortunately, the Commissioner's argument appears to address Claimant's Residual

Functional Capacity and Claimant's credibility, which were not directly raised by Claimant and

did not address the specific issues raised by Claimant.[6]

---

[6] The Court reminds counsel for the Commissioner that LR Gen P 86.02(d) specifically
requires defendant to address all plaintiff's contentions and arguments in the same order in
which the plaintiff stated them in plaintiff's brief.

The only request by Claimant that the Court can find in the record is a letter dated September 21, 2007, written by Claimant's counsel to the Appeals Council.[7] The final paragraph requests permission to file briefs on pertinent facts and legal issues.

The only indication in the record is that the Appeals Council did grant Claimant's request to submit legal briefs on pertinent facts and legal issues. The record shows that the Appeals Council received additional evidence, which it made part of the record.[8] The additional evidence included medical records and a legal brief dated October 26, 2007 from Richard K. Wehner, Esq.[9] The Appeals Council permitted Claimant to submit legal briefs. Therefore, the Appeals Council did not violate the Code of Federal Regulations and Claimant's contentions I and II are without merit.

III. The Appeals Council Violated 20 C.F.R. 404.976
by Refusing to Consider New Evidence Submitted;
AND
IV. The Appeals Council Violated 20 C.F.R. 404.970
by Refusing to Consider New Evidence Submitted;
AND
V. The Appeals Council Violated 20 C.F.R. 404.1785 by
Refusing to Consider Plaintiff's Material Evidence.

Claimant contends that the Appeals Council violated the Code of Federal Regulations by failing to grant Claimant the right to file new evidence and thus consider new, material evidence.

Unfortunately, the Commissioner's argument appears to address Claimant's Residual Functional Capacity and Claimant's credibility, which were not directly raised by Claimant and

---

[7] Tr. 14

[8] Tr. 8

[9] Exhibit AC-9: legal brief dated October 26, 2007, from Richard K. Wehner, Esq.

did not address the specific issues raised by Claimant.

The Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y Dept. Of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (en banc). Evidence is new within the meaning of this section if it is not duplicative or cumulative. Id. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id. (citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985)). The Fourth Circuit Court of Appeals has decided, albeit in unpublished opinions, that the Appeals Council does not need to engage in a detailed analysis of new evidence. Freeman v. Halter, No. 00-2471, 2001 WL 847978, at *2 (4th Cir. July 27, 2001); Hollar v. Comm'r, No. 98-2748, 1999 WL 753999, at *2 (4th Cir. Sept. 23, 1999).

Claimant contends that the Appeals Council refused to consider the new evidence submitted by Claimant. Claimant's argument is without merit. In its Notice of Appeals Council Action, the Appeals Council states first "After considering the additional information . . .," and later, "In looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council."[10]

Though the Appeals Council did not engage in a detailed analysis of the new evidence, it had no legal obligation to do so. The Appeals Council stated that after considering the additional information it found no reason for changing the ALJ's decision. This explanation was adequate

---

[10] Tr. 5. Also, in the Order of Appeals Council, the Appeals Council indicates it has "received additional evidence which it is making part of the record." Tr. 8-9.

and indicated that the Appeals Council did consider Claimant's additional information.

Therefore, the Appeals Council did not err.

Additionally, though the additional evidence was considered, the Appeals Council had no legal duty to consider four of the nine pieces of additional evidence offered by the Claimant. In his Order of Appeals Council, Claimant submitted:

> Exhibit AC-1: letter from Dr. Roger A. Lewis dated September 11, 2007
> Exhibit AC-2: medical record from Wake Medical Center dated July 16, 1997
> Exhibit AC-3: medical record from Wayne Memorial Hospital dated July 16, 1997
> Exhibit AC-4: Veteran's Administration medical evidence dated June 20, 1967 through July 11, 1984
> Exhibit AC-5: annotated letter from Leslie R. Cole (Claimant) dated August 22, 2007
> Exhibit AC-6: medical record from Dr. Michael Dwyer dated August 4, 2007
> Exhibit AC-7: medical record from Bolinger Chiropractic Center dated October 11, 1998 through January 26, 1989
> Exhibit AC-8: letter from C&P Enterprise's Inc. dated August 16, 2007
> Exhibit AC-9: legal brief dated October 26, 2007, from Richard K. Wehner, Esq.[11]

The Appeals Council must consider evidence new, material, and "relating to the period *on or before the date of the ALJ's decision*." <u>Wilkins</u>, 953 F.2d, at 96 (emphasis added). Though the Appeals Council indicates it considered the additional evidence, it had no legal duty to consider Exhibits AC-1, 5, 6, or 8 as these letters and medical records were issued after July 24, 2007, the date of the ALJ's decision.[12] Therefore, the Appeals Council did comply with its duties under the Code of Federal Regulations.

## IV. Recommendation

For the foregoing reasons, I recommend that:

---

[11] Tr. 8-9.

[12] Commissioner argues that the ALJ correctly assessed Claimant's Residual Functional Capacity and Claimant's credibility. However, these issues were not raised by the Claimant.

1.        Claimant's Motion for Summary Judgment be **DENIED** because the Appeals Council followed the applicable law in its review of the additional evidence together with the ALJ's decision.

2.        Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: September 11, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE